IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michael Catinella | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15 C 1400 |
| | ) |
| County of Cook, Cook County Department of Transportation and Highways | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

This action arises out of plaintiff's termination from his employment as a machinist with the Cook County Department of Transportation and Highways ("CCDOTH"). In his First Amended Complaint ("FAC"), plaintiff claims that his termination was discriminatory and retaliatory, and that it violated his procedural and substantive due process rights. He seeks damages and reinstatement pursuant to 42 U.S.C. § 1981 and § 1983.

Defendants have moved to dismiss the FAC pursuant to Rule 12(b)(1) and 12(b)(6). I dismissed plaintiff's original complaint without prejudice under Rule 12(b)(6) and granted him leave to amend after he acknowledged that his federal claims "require[d] further clarification." As explained below,

however, the additional material set forth in the FAC does not clarify his claims. Indeed, plaintiff's scattershot account of various events preceding his termination does not raise a reasonable inference that defendants violated his constitutional or civil rights. Accordingly, I grant defendants' 12(b)(6) motion to dismiss.

I.

The FAC recounts the following facts, which I assume to be true for purposes of this opinion. Plaintiff, a Caucasian man, was hired as machinist for CCDOTH in January of 1994, and he performed his duties to defendant's satisfaction at all times. Plaintiff was highly regarded by his peers and his supervisors. Around 2009, plaintiff was promoted to a supervisory position. He was not disciplined at any time prior to January 2013. FAC ¶¶ 10-15.

In or around August of 2012, Cook County awarded a fuel pump contract to a bidder. After bidding had closed, a losing bidder that had previously been awarded Cook County contracts complained (the FAC does not say to whom) and attempted to make a second bid after being informed of the winning bid amount. *Id*. at ¶¶ 16-17. The FAC provides no additional facts about the fuel pump contract, the bidding process, or the losing bidder's complaint, nor does it indicate whether or how plaintiff was involved in these matters.

2

On approximately August 15, 2012, plaintiff and his attorney met with the Office of the Inspector General ("OIIG")[1] "regarding an investigation into bidding for fuel pumps with CCDOTH." *Id*. at ¶ 18. During that meeting, OIIG investigators "urged Plaintiff to sign two documents relating to the investigation of the fuel pump bids," but did not allow him to consult with his attorney. Although the investigators warned plaintiff that he could lose his job if he refused to sign the documents, plaintiff refused to sign. *Id*. at 19-23. The FAC does not allege the nature of these documents.

After plaintiff refused to sign the documents, OIIG investigators asked him if he had any weapons on him. Plaintiff produced from his back pants pocket a small knife that he used in his work and handed it over to his attorney. OIIG investigators did not inspect or handle the knife and did not notify the police that plaintiff was in possession of it. *Id*. at ¶¶ 24-28. Plaintiff was subject to no further inquiry, complaint, investigation or discipline of any kind as a result of that meeting. *Id*. at ¶ 29. Plaintiff alleges, on information and belief, that he did not receive or sign a warning of rights form at this interview. *Id*. at ¶ 69.

---

[1] I assume that this refers to the Cook County Office of the Independent Inspector General.

On or around January 24, 2013, five CCDOTH employees filed a grievance complaining that plaintiff had been assigned to a higher rated position than they, "and that [plaintiff] was provided with an automobile, a cell phone and significant overtime." *Id*. at ¶ 31. The five grievants' names appeared to have been written in the same hand on the grievance form, and only one of the grievants signed the form. *Id*. at ¶ 33-34.

A little over a week later, on February 2, 2013, defendants informed plaintiff that he was being placed on emergency administrative leave with pay pending an investigation, and that he would receive a letter about the investigation. *Id*. at ¶ 36. Plaintiff received a letter on February 4, 2013, informing him that he was being placed on emergency suspension as a result of unspecified allegations that he had violated Section 8.03 ("major causes") of the Cook County Personnel Rules. *Id*. at ¶ 37.

After plaintiff was placed on emergency suspension, the Cook County Sheriff's Police Department received information from Investigator Ruffolo of the Cook County Bureau of Administration that plaintiff "may be a threat to shoot up the workplace." *Id*. at ¶ 38. On February 5, 2013, Investigator Ruffolo brought four witnesses to police headquarters—Messrs. Varnagis, Crane, Stiff, and Pijanowski—to report plaintiff's alleged threats to this effect. Two of the witnesses—Varnagis

4

and Pijanowski—were among the individuals who had filed the grievance relating to plaintiff's position and benefits several weeks earlier. *Id*. at ¶¶ 38-39.

The four witnesses gave inconsistent accounts of plaintiff's threats. Some of the statements were based on hearsay. In addition, Varnagis and Pijanowski were not physically present at District 3, where plaintiff worked, and thus could not have witnessed the alleged threats. Finally, the witness statements were inconsistent with the account of another individual, Gary Roden, who "stated he had never seen the Plaintiff make any alleged threat at all relevant times."[2] *Id*. at ¶ 40. Varnagis signed a complaint for disorderly conduct. *Id.* at ¶ 41.

Thereafter, the Cook County Sheriff's Police Department advised plaintiff of the investigation[3] and the disorderly conduct complaint and requested that plaintiff "turn himself

---

[2] It is not clear when or in what context Gary Roden gave his account, as he is not among the witnesses alleged to have accompanied Ruffolo to the police station, and the only other reference to him in the FAC states that his name was printed on the January 24, 2013, grievance form. FAC at ¶ 33.

[3] It appears from context that "the investigation" here refers to law enforcement's investigation into plaintiff's alleged threats, but the reference is not entirely clear. Indeed, the FAC and plaintiff's response brief refer to multiple investigations, including the OIIG's investigation into fuel pump bidding, defendants' investigation into to the January 24, 2013, grievance, and the OIIG's investigation into plaintiff's possession of a pocket knife, and plaintiff's allegations and arguments do not always make clear which investigation is at issue.

5

in." *Id*. at ¶ 42. Plaintiff self-surrendered on February 6, 2013, and he was arrested for disorderly conduct. He was advised of his *Miranda* rights and refused to speak to investigators or to sign any documents. Plaintiff was processed and released on a $120 bond. *Id*. at ¶¶ 42-45.

On February 8, 2013,[4] the OIIG "issued a summary report...in which it made a quasi-criminal finding that the Plaintiff violated Cook County Personnel Rule 8.03(b)(5) prohibiting unauthorized possession of weapons." *Id*. at ¶ 46. The OIIG did not have evidence of the alleged weapon, and it issued the report without affording plaintiff notice and the opportunity to be heard. *Id*. The report also stated that plaintiff had violated the Illinois Criminal Code, although it lacked "the authority to make that decision" and did not provide plaintiff "any type of due process." *Id*. at ¶ 48.

On February 22, 2013, CCDOTH notified plaintiff that a pre-disciplinary meeting would be held on February 28, 2013. Plaintiff was not informed that he could have an attorney present at that meeting and believed that he could not. *Id*. at ¶¶ 53, 56. On February 25, 2013, Pijanowski met with OIIG investigators and stated that he had "only observed Mr. Catinella in possession of legal pocket knives." *Id*. at ¶ 54.

---

[4] The FAC identifies the date as February 8, 2015, but I assume this is a typographical error.

6

Plaintiff attended the February 28, 2013, pre-disciplinary meeting, as did a member of the CCDOTH and a member of the OIIG. Plaintiff refuted the charges against him, stating that the OIIG investigation was "flawed and that he did not have an illegal knife, let alone two illegal knives as alleged against him." *Id*. at ¶¶ 55, 57. The FAC does not indicate what evidence, if any, was presented to support the allegations against plaintiff. It states, however, that OIIG investigators did not have any physical evidence of the alleged knife or knives and were not qualified to determine what kind of knife plaintiff had in his possession. *Id*. at ¶¶ 58-59. Plaintiff was not allowed to question OIIG investigators during the hearing. *Id*. at ¶ 61. Plaintiff was never arrested, charged, or convicted for being in possession of an illegal knife, and his disorderly conduct case had not been adjudicated by the time of his pre-disciplinary hearing.[5] *Id*. at ¶ 63-64.

---

[5] In recounting the factual narrative set forth in the FAC, I have at times reordered its allegations to reflect my understanding of how plaintiff views the various events it describes as related and why he claims they are unlawful. In some instances, however, the allegations are difficult to situate in the proper context. For example, plaintiff asserts in ¶ 65 that "[u]pon information and belief, the Plaintiff was not allowed to confront any alleged complaining witnesses regarding the alleged threats." Based on where this allegation appears in the complaint, the statement seems to refer to the pre-disciplinary hearing about the knife. Yet, the references to "complaining witnesses" and "alleged threats" suggest that it might instead relate to the workplace threats leading up to the disorderly conduct charge.

Defendants terminated plaintiff's employment on March 5, 2013, citing the "major causes of 'Fighting or Disruptive Behavior' and 'Unauthorized Possession of Weapons'" as the reasons for his termination, and relying on the OIIG's February 8, 2013 OIIG report. *Id*. at ¶ 66, 67. Defendants also cited plaintiff's alleged workplace threats in support of the "Fighting or Disruptive Behavior" ground for his termination. Defendants further identified several "non-major cause violations," which plaintiff claims are subject to progressive discipline and are not grounds for immediate termination under the County of Cook Personnel Rules. *Id*. at ¶ 70.

On March 7, 2013, the OIIG interviewed Darryl Stiff (one of the witnesses who had accompanied Ruffolo to the police department to report plaintiff's alleged threats) and Andrew Chapman (one of the individuals whose name appeared on the January 24, 2013 grievance, but who was not involved in the police report) about the alleged threats. Each of these individuals was given a warning of rights form and acknowledgment. FAC at ¶¶ 73-73. During his interview, Chapman produced a three-inch spring knife that was used to cut hoses at work. The OIIG took pictures of Chapman's knife and confiscated it "until further research of governing statutes is conducted to determine lawful possession of the knife." Chapman was not discharged for possessing the knife. *Id*. at ¶¶ 74-78.

Plaintiff grieved his termination on March 27, 2013. His grievance was "summarily denied at Steps 1 and 2 by his immediate supervisor and the CCDOTH" and was denied at Step 3 "by the hearing officer." *Id*. at ¶¶ 80-82. Plaintiff asserts that the hearing officer's decision "had multiple inconsistencies," citing the conflicting testimony of witnesses to plaintiff's alleged workplace threats, and the fact that "there are two decisions upholding the termination that are signed but contain different formatting and information."[6] *Id*. at ¶ 83.

On October 4, 2013, the disorderly conduct charge against plaintiff was dismissed because Varnagis, the complaining witness, "refused to appear and testify since Plaintiff had been terminated from his position." *Id*. at ¶¶ 84.

The FAC culminates in four separate, but substantially overlapping, counts. Counts I and II are both captioned "Violation of Plaintiff's Procedural and Substantive Due Process Rights" and assert § 1983 claims. In these counts, plaintiff asserts that his termination violated due process rights enshrined in the Fifth and Fourteenth Amendments because he was

---

[6] Plaintiff also cites as an inconsistency in the hearing officer's decision that "the original workplace grievance of January 24, 2013 was filed due to Plaintiff being given preferential consideration for a temporary special assignment." The FAC does not explain the relevance of this allegation to the hearing officer's decision, however, nor does it explain the putative inconsistency.

not afforded a hearing, the opportunity to confront witnesses, or progressive discipline. Counts III and IV are both captioned "Discrimination Based on Retaliation." Count III asserts a violation of § 1981, stating that plaintiff's termination was "politically motivated and in retaliation for his position within the CCDOTH." Count IV is based on § 1983 and claims that defendant's termination was baseless, was effected without due process, and violated his equal protection rights because of defendants' "disparate treatment to employees who report violations or assert lawful rights." Plaintiff seeks damages, reinstatement, and attorneys' fees.

II.

Before examining a few of the specific reasons the FAC fails to state an actionable claim, I pause briefly to address its overarching flaw, which is that a careful reading of its allegations produces no clear understanding of plaintiff's theory of how the various events it describes add up to either a cognizable constitutional claim or a plausible civil rights violation. The salient portions of plaintiff's narrative seem to be: 1) plaintiff's refusal to sign documents at the August 15, 2012, meeting about the fuel pump bidding; 2) plaintiff's production of a knife at that meeting; 3) a grievance filed by five coworkers regarding plaintiff's superior job position; 4) plaintiff's placement on emergency administrative leave and

emergency suspension; 5) the instigation of charges against plaintiff for disorderly conduct; and 6) plaintiff's termination. While the labels plaintiff affixes to his claims—including "due process," "equal protection," and "retaliation"—broadly identify possible legal theories, labels and conclusions such as these do not suffice to withstand dismissal. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007).

The pleading standards of Rule 8 are not exacting, but they require plaintiffs, at a minimum, "to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The FAC does not satisfy this lenient standard. Plaintiff evidently believes that his employer retaliated against him – but for what? For failing to sign whatever documents the OIIG presented him with in August of 2012? Without some indication of what those documents were, how they related to plaintiff's employment, or how signing them (or refusing to sign them) amounted to protected conduct, we are left with no facts or context from which a plausible due process, equal protection, or civil rights claim can be extracted.[7] As for the knife, the grievance, the investigation,

---

[7] Based on the scant facts the FAC provides, plaintiff's claim, if any, may be better suited to a theory of retaliatory discharge under state law, or possibly of retaliation for the exercise of his First Amendment rights. *See, e.g., Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 628 (7th Cir. 2009). The FAC does not assert either type of claim, however.

11

the suspension, and the disorderly conduct charge, it is impossible to discern from the FAC's account of these episodes how they coalesce into a claim redressable under the Constitution, § 1981 or § 1983. For this reason alone, the FAC must be dismissed.

But there is more. Each of plaintiff's specific claims suffers from numerous defects, not all of which require discussion. I begin with his claim for procedural due process, to which the Seventh Circuit takes a two-step approach. The first question is whether the plaintiff has been deprived of a protected liberty or property interest, and second is whether the deprivation occurred without due process. *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865 (7th Cir. 2009). Plaintiff's claim does not cross the first hurdle.

Because plaintiff was employed in Illinois, I look to Illinois law to determine whether he had a protectable property interest in his employment. *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). "Under Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Id*. A legitimate claim of entitlement, in turn, "can arise from a statute, regulation, municipal ordinance, or an express or implied contract." *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996). Plaintiff does not allege

12

that the property interest he asserts is rooted in any such authority, nor does he claim that any state statute, common law rule, or collective bargaining agreement constrained defendants' ability to terminate his employment. Instead, plaintiff points to his satisfactory job performance, his high regard among colleagues and supervisors, his promotion, and the fact that he "did not lose his job after being threatened by the OIIG" as establishing his protected property interest. He cites no authority, however, holding that allegations of this sort state a protected property interest.

Plaintiff also cites his "understanding" that under "Cook County policies and procedures...he could not be terminated from his employment unless the steps were followed." Resp. at 6. This appears to be a reference to the FAC's allegation that certain of defendants' asserted grounds for his termination were "subject to progressive discipline pursuant to County of Cook Personnel Rules." FAC at ¶ 71. But none of plaintiff's cited authorities supports the view that this unadorned reference to progressive discipline is sufficient to state a protected property interest in his job.

Indeed, in four of plaintiff's cited cases, the court *declined* to find a protected property interest. *See Covell v. Menkis*, 595 F. 3d 673, 675-676 (7th Cir. 2010) (state agency's administrative rules and bylaws did not create protected

13

property interest in agency director's employment); *Moss v. Martin*, 473 F.3d 694 (7th Cir. 2007) (Illinois Department of Transportation's Personnel Policy Manual did not give rise to employee's protected property interest); *Khan v. Bland*, 630 F.3d 519 (7th Cir. 2010) (landlord had no protected property interest in future Section 8 Housing Assistance Payment contracts); and *Ruiz v. Kinsella*, 770 F. Supp. 2d 936 (N.D. Ill. 2011) (home buyers had no protected interest in City of Chicago's enforcement of building code). The remaining two cases arose in distinct factual contexts, and neither remotely supports plaintiff's claim to a protected property interest in his employment. *See Mathews v. Eldridge*, 424 U.S. 319 (1976) (recipient of social security benefits had protected interest in continued receipt of benefits); *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F. 3d 865 (7th Cir. 2009) (holder of unrestricted municipal liquor license had a protected property interest in license to operate during the same hours as all license holders). Accordingly, plaintiff has no viable procedural due process claim.[8]

---

[8] Because plaintiff's claim fails the first prong of the procedural due process inquiry, I need not proceed to the second. I note, however, that even assuming plaintiff could establish a protected property interest in his employment, his allegations regarding the pre-discipline meeting at which he "refuted" the allegations against him as well, as the three step grievance process—which, by his own account, included a hearing—

14

Plaintiff's substantive due process claim fares no better. Because "this sort of claim is limited to violations of fundamental rights," and employment-related rights are not fundamental, "an alleged wrongful termination of public employment is not actionable as a violation of substantive due process unless the employee also alleges the defendants violated some other constitutional right or that state remedies were inadequate." *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) (citing *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007). Plaintiff has not pled an additional constitutional violation, nor has he claimed that state-law remedies were inadequate.

Plaintiff argues, nevertheless, that his substantive due process claim survives defendants' motion because he alleges conduct by defendants that "shocks the conscience," citing *Belcher*, 497 F.3d at 753. He points specifically to allegations that defendants placed him on emergency leave as a result of a stale grievance,[9] relied on inconsistent evidence to suspend him for disorderly conduct, and enforced rules prohibiting knives at

---

blunt the force of his claim to have been terminated without adequate process.

[9] Actually, the FAC does not assert that the investigation prompting plaintiff's administrative leave related to the grievance. In fact, one might guess from the reference to "major causes" in the letter plaintiff received shortly after being placed on emergency leave that the investigation related to the knife incident.

the workplace in a non-uniform fashion. Resp. at 7. But neither *Belcher* nor any other case plaintiff identifies held that allegations of this sort stated a substantive due process claim. To the contrary, the scope of such claims is extremely narrow, and "[c]ases abound in which the government action—though thoroughly disapproved of—was found not to shock the conscience." *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (citing as a "notable" example *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), which involved a high-speed chase in which a patrol car skidded into a sixteen-year old motorcycle passenger, propelling him seventy feet down the road and inflicting massive injuries that led to his death). The allegations in the FAC clearly do not describe conduct anywhere near as egregious as the conduct alleged in *County of Sacramento* (which the Supreme Court nevertheless found wanting), and plaintiff offers neither argument nor authority to support his substantive due process claim on the facts asserted.

I now turn to plaintiff's claims for "discrimination based on retaliation," which do not require lengthy discussion. As noted above, no clear theory of either discrimination or retaliation can be pieced together from the FAC's narrative of the events that preceded plaintiff's termination, but in response to defendants' motion, plaintiff argues that his suspension and termination were the result of "reverse

retaliation." Resp. at 8. He further argues that *Monell* liability is appropriate because the FAC articulates an "unconstitutional reverse discrimination based policy, practice or custom." *Id.* at 8-9. But the FAC's substantive allegations do not support either argument.

Plaintiff is correct that in *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008), the Supreme Court held that § 1981 encompasses claims for employment-related retaliation. The Court acknowledged that a right of action exists under that section for an individual "who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 rights." *Id.* at 452. That holding, however, has no application to the present case. The FAC does not allege the race of any individual other than plaintiff, much less does it assert that any "different individual" was subject to racial discrimination. For these reasons alone, the FAC fails to state a viable retaliation claim under § 1981.

Additionally, as plaintiff acknowledges, Caucasians claiming reverse-discrimination must allege "background circumstances sufficient to demonstrate that the particular employer has reason or inclination to discriminate invidiously against whites...or evidence that there is something fishy about the facts at hand." *Hague v. Thompson Distribution Co.*, 436 F.3d

17

816, 820 (7th Cir. 2006) (internal quotations and citation omitted). The FAC is devoid of any allegations of this sort, however, fatally undermining any claim of race-based discrimination. Finally, to the extent plaintiff's § 1983 claim is premised on some other, non-race-related protected activity (e.g., "political" activity), the FAC's allegations are far too sparse and muddled to support any such claim.

Because plaintiff's § 1981 and § 1983 claims fail for the reasons discussed above, I comment only briefly on plaintiff's additional failure to articulate a basis for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), which is an independent reason for dismissing the latter. A *Monell* claim requires plaintiff to allege: "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Darchak*, 580 F.3d 622 at 629. Despite plaintiff's conclusory assertion to the contrary, the FAC plainly contains no allegations of this nature.

### III.

For the foregoing reasons, defendants' motion is granted.[10]

---

[10] Mindful that federal courts have a duty to satisfy themselves of their own jurisdiction, *see Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142, 1144 (7th Cir. 1993), I have considered defendants' additional argument that the FAC should be dismissed for lack of subject matter jurisdiction, and I conclude that it has no merit. The gist of the argument is that plaintiff's

18

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 27, 2016

---

allegations, properly construed, state a claim, if at all, for violation of his CBA, and that the Illinois Public Labor Relations Board has exclusive jurisdiction over such claims. But the FAC does not purport to advance such a claim, and indeed, plaintiff's response explicitly disavows it. Resp. at 4.